WILLIAM A. ZIMMER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zimmer v. Commissioner
Docket No. 1361-88
United States Tax Court
T.C. Memo 1993-560; 1993 Tax Ct. Memo LEXIS 574; 66 T.C.M. (CCH) 1443; November 29, 1993, Filed *574 Decision will be entered for respondent. William A. Zimmer, pro se. For respondent: Robin F. Kaufer and Michael E. Melone. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 61,664 in petitioner's Federal income taxes for 1981, additions to tax of $ 3,083 under section 6653(a)(1), 50 percent of the interest due on the full amount of the deficiency under section 6653(a)(2), and additional interest under section 6621(d). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. The deficiency, additions to tax, and additional interest arose from respondent's disallowance of losses claimed by petitioner in relation to a partnership, Southwestern Government Securities Co. (Southwestern), that entered into transactions with First Western Government Securities, Inc. (First Western). Petitioner has conceded that he is liable for the deficiency and for the additional interest under section 6621(d). Still in dispute is petitioner's liability for the additions to tax under section 6653(a)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated *575 facts are incorporated in our findings by this reference. Petitioner resided in California at the time he filed his petition. Prior to and during the year in issue, petitioner was a stock and commodities broker who had experience in trading in stocks and commodities for his own account and for clients. Petitioner engaged in tax straddles through which recognition of capital gains on transactions was postponed from year to year by the use of forward contracts. Beginning in 1978, First Western offered a promotion purportedly involving forward contracts for Government mortgage-backed securities. The relevant facts and circumstances relating to the First Western promotion are set forth in the findings of the Tax Court in , which findings are incorporated herein by reference as though set forth in full herein. The decision of the Tax Court was affirmed by the Court of Appeals for the Fifth Circuit in , affd. on other grounds . There was neither a market for *576 nor published prices for the forward contracts that were written by First Western. First Western set the prices for its contracts using a computerized price algorithm, which was not disclosed to its customers. First Western did not quote prices to dealers. First Western dealt only in complete portfolios of straddles, not individual contracts. The size of the portfolio was based on the amount of the requested tax loss, taking into account the time remaining in the tax year to achieve the requested tax loss. The tax data provided by Southwestern was put into First Western's computer. Based on the tax loss requested by Southwestern, First Western created a portfolio of forward contracts on its computer in which Southwestern simultaneously contracted to buy securities at some future date (the "long" leg of the straddle) and to sell similar securities at a future date (the "short" leg of the straddle). First Western unilaterally set the prices for all contracts based upon its pricing algorithm. Petitioner was introduced to First Western by Richard McDonald (McDonald) of Southwestern. Petitioner was given a copy of the Southwestern brochure that described its program. The brochure *577 contained a lengthy analysis of the alleged tax advantages of the program and included warnings such as the following: 3. Tax Consequences. Due to the controversial nature of the possible income tax deferral and conversion benefits which may be related to contracts presently held by the Partnership, the IRS [Internal Revenue Service] may seek to substantially limit any such benefits. The Partnership believes that at the present time the IRS is auditing a number of taxpayers with respect to commodity transactions resulting in a tax loss offset by balanced positions of the type addressed by recent legislation. Because of the complicated nature of the law and its varying application depending upon the facts and circumstances of each Partner and the activities of the Partnership, each prospective partner is required to consult with and rely upon his personal tax advisor(s) with respect to the tax aspects of becoming a Partner in the Partnership.
Petitioner consulted with his certified public accountant, Robert Brogan, and with McDonald and decided to invest in the partnership. In or about October 1981, petitioner executed a subscription agreement and paid Southwestern *578 $ 18,000. The amount paid by petitioner was based on the amount of tax loss requested by petitioner. On his Federal income tax return for 1981, petitioner claimed a deduction in the amount of $ 129,854 based on losses allegedly incurred as a partner in Southwestern. OPINION Respondent determined that petitioner is liable for an addition to tax under section 6653(a) for negligence. Section 6653(a) provides in relevant part that, "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." "Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances." (quoting , affg. on this issue ; see also , affg. . Petitioner has the burden of establishing *579 that his actions were not negligent. . Petitioner contends that the addition to tax under section 6653(a) is unwarranted here because he exercised due care when he entered into the transactions with First Western. He states that he talked to his accountant about the transactions and was assured that they were legal and reasonable. He also contends that he expected to make a profit on the transactions as interest rates declined. His testimony was general and vague, providing no details of his inquiry to his accountant, the accountant's advice, or the manner in which petitioner purportedly would make a profit from a decline in interest rates. On cross-examination, he could remember almost nothing about his analysis of the program. He admitted that he knew "not much of anything" about McDonald's background, although he allegedly relied on McDonald in entering into the transactions. As to his accountant's expertise, he testified: A. I think his was probably basically limited to futures straddles the same as mine. I don't know that he had any particular expertise in the area of this forward cancellation.
*580 Petitioner has not persuaded us that his situation is any different from that of the taxpayers in Freytag or in related cases where the negligence additions to tax were upheld. See , where we concluded that such taxpayers failed to investigate reasonably and must have known that the First Western scheme was too good to be true. Petitioner paid $ 18,000 and claimed a tax deduction of almost $ 130,000. We conclude that he was negligent in doing so. See . Decision will be entered for respondent.